All rise. This court for this session, I mean this court now resumes its session. Okay, there we go. Well, here we are after our recess. We've got two cases remaining. The first is United States v. Rushing. We've scheduled that one for 15 minutes aside, and I hope I can pronounce your name correctly. Mr. Wojnarowski, I believe you'll go first. Good afternoon, Your Honors. For the record, Mick Wojnarowski on behalf of Mr. Rushing, the appellant. I would like to reserve five minutes for rebuttal. Okay. Your Honors, fundamental in our Fourth Amendment protection is the right to be left alone. Terry's stop has been carved out as an essential rule that seizures and searches need to be supported by warrants. One could say that it is a limited transfer of liberty from us, the people, over to the police because we've made the decision that law enforcement stop-and-frisk practices are a valuable tool that serves a purpose, that serves a common good. We've even gone as far as to accept mistakes by the police when it comes to Terry stops. One could say that in this arena, what we've said is that good enough is good enough. In Mr. Rushing's case, the police error, the police mistake in detaining him on the suspicion that he was a different individual, a different individual, is largely the reason why we are asking the court to intervene and reverse the lower court and grant Mr. Rushing's request. Well, I agree the photos in your brief look quite different from one another, but they didn't just go off of photos. They went off also of the fact that he came out of that particular car. As I understand it, at the time, before he was approached, they knew that this other fellow had been arrested out of that car and that it was registered to that fellow's fiancée. So why isn't that put together? We're not sure it's him, but you know, it's enough that we should find out. Certainly, the totality of the circumstances analysis applies to the stop, Your Honor. And yes, the Seattle Police did have information. I would suggest that it was stale at this point that Mr. Pines had been arrested out of that car four months prior to Mr. Rushing's arrest. That information did not suggest that Mr. Pines was the owner of the vehicle, that he was registered to a woman. And I think that undercuts the initial... Yes, I believe that was known to law enforcement before they detained Mr. Rushing. That still doesn't... I suppose that could weigh in favor of the first supposition of the police, which is that Mr. Pines is driving the vehicle. But the case involves a second supposition, if you will, which is that the law enforcement's conclusion that Mr. Rushing was Mr. Pines. And there were a number of things that law enforcement should have been considering and seem to have skipped over when viewing the case. First, Mr. Pines is noticeably older. I'm sorry, Mr. Rushing is noticeably older than Mr. Pines. The video shows that Mr. Rushing appears to be a large man, and he was in fact about 180 pounds on the day of this arrest. The information pertaining to Mr. Pines, ostensibly the driver of the Lexus, suggested that he was about 140 pounds. So that's a significant difference in what they would present like. I think the video evidence helps to both show that there was a detention and that it was not reasonable. I would draw the court's attention to the fact that law enforcement's supposition here was that the suspect had an outstanding warrant for his arrest. In reality, on that particular evening, Mr. Rushing did not behave in a way suggesting that he was trying to hide from the police. He did not engage in any furtive movements through Pioneer Square. He walked out of this car and walked into a bar with law enforcement never seeing him talk to anyone, never seeing him engage in anything they might suspect. When you say he wasn't engaged in anything that looked furtive, was he aware that law enforcement was observing him? That does not appear to be in the record, Your Honor. So, I mean, if someone has an arrest warrant out against him, my sense is that they're not always going to be just kind of darting and hiding behind corners and so on. I mean, they'd be walking around normally. So the fact that he might not have acted in a furtive way doesn't tell us very much, I think. Well, in the recording from the dash cam in the car, the police officer suspected that he would run as soon as he would see them, which would be something that someone with a warrant might do. Here, in fact, Mr. Rushing, when the three officers walked up towards him towards the entrance of the tavern, he stayed put, looked at them, and answered their questions. I would suggest that that's an example of non-furtive behavior. Well, he becomes furtive. He does run later. He does. And in the video, that is a reaction or a response to Officer Nelson placing his arm on Mr. Rushing. When we think about stop-and-frisk as a law enforcement tool, I think the leeway that law enforcement gets and the breadth of the net that it gets passed, it has to be related to the level of information available to them. And that's certainly under the legal standard that applies to analyzing decisions. We look at both the content of the information and the reliability of the information that the police are operating with. So I would suggest that had law enforcement not been privy to a photograph of Mr. Pines, the suspect, and they were operating with a far more general description of a potential warrant suspect, that they would have been permitted to cast the net more broadly. If we look at the United States v. Castro case, which the lower mistake was reasonable, the information that law enforcement had there was limited to a suspect driver's race as a Hispanic male, and I believe his weight and association with a car. But when the situation shifts and when the level of information that's available to law enforcement has gone up, that net that they cast about in fishing for a suspect needs to be drawn down. What about the alternative theory that they had reasonable suspicion to suspect him of drug trafficking, given what they had seen in terms of his interaction with the other vehicles? Your Honor, respectfully, the data before us would not sustain that conclusion. The court, this court has long held that mere presence or mere association with someone does not give rise to an inference that they themselves are engaged in criminal activity. What law enforcement saw is that this driver of a Lexus, who was not an expected arrival near the SUV that they were surveilling, went and spent some time with people that they were surveilling for possible drug activity. And apparently, the amount of time that Mr. Rushing spent in that SUV was longer than the amount of time that other individuals who had been seen interacting with these other suspected dealers were spending in their car. So Mr. Rushing spends an unusually longer amount of time with these people and gets out, spends some time that's limited inside this way. In the other surveillance actions that law enforcement had done that were associated with this investigation, they had seen these people interacting with the SUV owners then engage in some sort of street level transaction. There's nothing of the sort when it comes to Mr. Rushing's behavior on that particular evening. And I would note that in closing argument, the government actually conceded that they don't need to prove that Mr. Rushing engaged in any sort of drug dealing on that particular day. Certainly, if there was reason to believe that that had been the case, the government would have pointed that out. Additionally, when the police sought a search warrant to go into the Lexus, the warrant application was predicated on a claim that was probable cause to believe that the vehicle would contain evidence of the crime of unlawful firearm possession, not the crime of possession of narcotics. I hope that answers the board's question. When I talk about this idea of a net and how broadly it gets to be cast about in a Terry stop, I think it is important to note here that prior to detaining Mr. Rushing, the same officers went out and stopped a different African American male near the vicinity of the tavern. That was a much older gentleman who has a beard. And on the recording, they recognize that the person they're about to stop does not even fit the physical description that was provided by the detectives in full. That description included a dark coat, jeans, and white shoes. They observe that, oh, we see this other person that's near the tavern. Maybe he is our suspect who possibly exited through some other door. He has some white on his shoes. And they decide that the information that they're operating with is sufficient to allow them to legally stop that individual. I think it's curious that that's the case here. But it also is not terribly surprising when we take note of racialized policing in this country, which is an objective reality for the City of Seattle Police Department. And in my briefing, I did reference data from the department itself, which shows that they disproportionately stop African Americans as opposed to African American population within the City of Seattle. It shows that the City of Seattle Police Department is wrong when it comes to making its Terry Frist decisions three out of four times. And this, I think, is part of the objective reality that we cannot turn our eyes away from, because it is relevant and it is important to note. I would point to the video transcript that shows the two officers waiting in the car. And they're talking to each other about the task that they've been asked to complete by the detectives. And they say, well, the detectives aren't so sure. They've said 50-50, which to me does not represent any sort of conviction. I think that's a representation of and lack of knowledge. But of course, for a Terry stop, you don't need certainty. 50-50 may be enough. Well, I don't. Yes, Your Honor, you don't need certainty for a Terry stop. I don't think that the representation made by the officers, it's 50-50, is a representation. We're almost at the halfway mark. I think it's an expression. It's a colloquial expression of uncertainty. That's how I would. Well, yes, of course, it's an expression of uncertainty. But you don't. But Terry doesn't require certainty. It does not. What is unique here is, and in fact, we just finished my train of thought, is that the two officers in the car talk to themselves. And they wonder, should we tell the detectives that maybe given that they're in plain clothes, they could go into the tavern and take a look at their suspect, keeping in mind what Pines looks like based on the photograph. And they could figure out for themselves whether it's the right guy or not. And then they kind of it's not our place to suggest that. And then I would ask the court not to conflate what the detectives knew with what the officers knew. Because in many investigations, as law enforcement does its work, the information that it acquires changes. And here, as those three officers approached Mr. Rushing outside the tavern, information available to them changed and became greater than the information previously available to the detectives. Suddenly, Mr. Rushing's face is illuminated with the light. They can tell that his complexion is honey, not reddish or dark brown, the way Mr. Pines is. They can tell that his facial features are round, that he has full cheeks, not an angular face and a broad nose, the way Mr. Pines does in the photograph. Frankly, these two men do not resemble each other. And it, how to put it, if Mr. Rushing at 185 pounds, looking the way he looks, were to have presented an ID to the bar doorman of Mr. Pines' in an attempt to get in with it, he would have been turned down, because it is not a match. But we don't stop there, because the next thing that happens as the officers approach is they ask him to identify his name, and he says, Jonathan. So he's responded, and he's provided information that ought to have let the officers know, and I think does let us know objectively, that whatever that quantum of a hunch existed in the minds of the detectives has certainly gone down. Okay. Yeah, you're toward the end here. Let's hear from the other side, but we'll make sure you get enough opportunity to respond. Good afternoon, Your Honors. May it please the Court. I'm Jonas Lerman, and I represent the United States. The facts that drive the Fourth Amendment analysis here are straightforward. They are largely undisputed, and they're captured on video. And the District Court got this right. In denying the suppression motions, the Court applied those straightforward facts to settled law. And I think it's important, I'm happy to talk about the vehicle search or the sufficiency, but I'll start with the Terry stop. This was a less than 20-second encounter. This would be, you know, a very different case if the officers had approached the defendant, asked him for identification, he'd provided it, they'd looked at it and seen that his name was Jonathan Rushing, not Nicholas Pines, and then they decided, we're going to pat you down anyway. That is, of course, not what happened. The officers tried to identify him. He gave a first name, but then he wouldn't take his hand out of his pocket, and in less than 20 seconds, he took off running. So they didn't need any reasonable suspicion to approach him on the street. I think that's one point to underscore. The Fourth Amendment was not implicated at all. That was a consensual encounter. This only turned into a Terry stop when he refused to take his hand out of his pocket, and Officer Nelson reached out and grabbed his left arm. And that's the moment when he took off running. Can I ask you about the first stop that your opposing counsel mentioned that we watch on the video? Let's say that that had ripened into a Terry stop as well. You would say that that stop too would have been justified? Is that right? You know, there's not very much information in the record about that stop. It's the dash cam video, I think, is the extent of it. And my view of the dash cam video, it looks like they walked up to him and pretty quickly realized he didn't look like the person they were looking for. I'm saying, let's say though, that they had immediately initiated a Terry stop. Like the guy wasn't going to stop walking, and they actually said, no, stop. What's your name? Okay. The reason I'm asking is because that guy looks nothing like Nicholas Pines in a way that to me, I mean, and that's why one of the officers says, that's not what the hell are we doing? Right. And so I'm just curious, or you would say, though, that, well, it's a black guy. They're looking for a black guy. They're in Seattle. I mean, that would have been okay. But or no, I'm just curious, what's your position? No, no, because no, I think from the dash cam, they don't think that that is the person who was in the Lexus. So regardless of whether he looked like Nicholas Pines, they don't think that is the person who was just meeting with the drug dealers in the, they didn't see the person in the Lexus. So they wouldn't know, right? All they got was a description. They got a description, and they saw that this person didn't meet the description. So I think the question is, you know, had they thought, regardless of, you know, whether they thought he was Nicholas Pines, had they thought that he met the description of the description, what was he wearing? Then I think there would have been reasonable suspicion for the reasons that we've, I think Judge Collins alluded to. Apart from the Nicholas Pines identity issue, there was just reasonable suspicion to think that, you know, there were articulable facts that criminal activity could be afoot here, but the person stopped previously was not the person they thought was engaged in that criminal activity. So, so no, I don't think, I don't think he falls in the same category. If that answers the court's question. Well, your position is just, let me just follow up. Your position is that the pictures are close enough, and that's why, you know, even though your opponent, of course, stresses the discrepancies between the photo that they had in front of them and what Mr. Rushing looks like, your position is well, it's, it's close enough. And so they didn't, they didn't have enough information to sort of confirm that it wasn't Mr. Pines. And so that's why they were justified in approaching him. Well, so there are two bases, I think, for reasonable suspicion for a stop of this, of this defendant. The first is that the police reasonably thought as they're approaching him, this could be Nicholas Pines, a wanted criminal. So it's reasonable to stop him and try to confirm his identity, which is exactly what they were trying to do before he took off running. The second basis is that apart from the Nicholas Pines issue, so apart from thinking we're stopping a person because he's got a warrant out for his arrest, they reasonably suspected criminal activity by the person who had just met with these drug dealers in the SUV and then gotten back into the passenger seat, not the driver's seat of the Lexus, where he stayed for about 20 minutes before going to the bar. But to answer your question, yes, I think the officers did think this was Nicholas Pines. And you can see that from the video, because after they, after he takes off running and they arrest him, Officer Nelson says, Nicholas Pines, you're under arrest. And the district court considered all of this. The district court did not clearly err in finding that the police did in fact believe this was Nicholas Pines. They were wrong, of course, but based on the facts that were available to them, and this took place at night, it was a less than 20 second encounter. It was reasonable for them to do what they did here. And I'm not sure what they were supposed to do differently. I mean, the defense's position is that as Officer Nelson walks up to the defendant and the defendant says the name Jonathan, just based on that, the police are just supposed to walk away and do nothing more. And I don't think that's what the Fourth Amendment required here, not remotely. And so it was reasonable for the police, at the very least, to try to confirm the identity of this person in this consensual encounter. And again, it only turned into a Terry stop after he refused to take his hand out of his pocket. And so the defense's contrary arguments to it, I think I just want to underscore. So if you can help me with this, locating in time, the Terry stop really takes place only when the officer stops him from taking his hand out of his pocket. At that point, what suspicion does the officer have to justify his stopping your client, stopping Mr. Rushing from taking his hand out of his pocket? I understand the officer's worried that he might have a weapon. Why does the officer have that suspicion? I mean, what's the level of suspicion that we have at that moment? Because there's not really a level of suspicion beforehand, because they had a right to stop him and ask him to identify himself. So the real question is, what's the level of suspicion and of what right then? So a couple of responses to that. The defense has never challenged the idea that there was reasonable suspicion to conduct a frisk here. The challenge is to the stop. So there's not a separate argument that the police did not reasonably suspect at that moment that Mr. Rushing was armed and dangerous. And the district court said that that was a reasonable suspicion for the police to have at that moment. I don't take the defense to be challenging that holding of the district court. And I think just stepping back from it under the totality of the circumstances, it was certainly reasonable for them to believe that someone who had just met with these armed drug dealers in a neighborhood known for drug trafficking, who they thought could be this wanted criminal Nicholas Fines, could also be armed and dangerous given that he twice refused to remove his hand from his pocket when asked. So under the totality of the circumstances, yes, it was certainly reasonable for the police to conduct, to try to conduct a frisk. Again, they never were able to because the defendant took off running. And there's no challenge to the legality of the arrest that followed. There's no challenge to the legality or that there was probable cause to arrest him when he took off running. There's also no dispute that he was searched incidents that that arrest. So all we're talking about is the reasonable suspicion standard, which under this court's precedent is less than probable cause. It's less than a preponderance of the evidence. It's a very low standard. And that's by design because police are making split second decisions in very difficult circumstances here. And this is the quintessential kind of example where they have to make a split second decision about what to do for officer safety. One question I had was about the defendant's request below for an evidentiary hearing. Yes. His position was that the whatever arrest record, whatever record the officers reviewed that told them that Nicholas Pines had been arrested in that out of that car four months earlier, whatever it was, that it would also have shown that he was that that he was, in fact, still in custody. And so therefore, you know, he had a basis, at least for alleging that all of this was kind of a pretext on their part. They knew that the Nicholas Pines that they saw the picture of, that that guy was actually still in custody from his arrest four months ago. And they went through, I don't know, whatever the charade was that they went through. The district court, I gather, just rejected that out of hand as what so preposterous that we don't need to have even any any kind of a formal suppression hearing. I'm just going to rule on this on the papers. Why was that correct, I guess, is what I'm wondering. Sure. No, district court did not reject this out of hand as ridiculous. What happened was, yes, as you say, the defense theory below, which they've abandoned on appeal, was that this was a malicious pretext stop. The police actually knew that this was not Nicholas Pines. It was not a case of mistaken identity. They knew it was not him. And one reason they knew was that Nicholas Pines was at the federal detention center in SeaTac, Washington, I think. And there was a speculation that this would have come up on the officer's monitor in the car. And so they would have known this. And they were all just lying. The government then responded by attaching body camera videos, which the defense had not attached to their suppression motion. And the body camera videos conclusively refute this theory, this malicious pretext theory, which is, I think, why the defense has now abandoned that theory on appeal in favor of this racism theory, which was not raised below. So now the argument is, this was just not a reasonable mistake. Below, it was, this was all intentional. It was a conspiracy by the police. When you watch the body camera videos, you can see when Nicholas Pines' booking photo comes up on the monitor. And you can see from the discussions between the police, they certainly don't know that this is not Nicholas Pines. They don't know that Nicholas Pines is in custody. There's confusion. They talk about, is it him? Is it not him? 50-50, it kind of looks like him, kind of doesn't. What should we do? None of that is consistent with this theory that they raised below. So the relevant facts were before the district court in these body camera videos. After the government filed its opposition with these body camera videos as exhibits, the defense filed no reply because there was nothing more to say. There was no more factual dispute with respect to the Terry stop. Everything the I'm happy to say more about it, but I hope that addresses your question, Judge Watford. Well, I guess I was a little, there was no suppression hearing of any sort, right? This was just decided on the papers and watching the body cam video, right? That's right. Yeah, that I guess. Yeah. So for the other, there was also a request. I was just going to say, there was also a request for a pranks hearing on the vehicle search, but yeah, there was no hearing heard on either. After the government filed its opposition with these body camera videos, as well as the search warrant affidavit and some other materials, the defense didn't file a reply and the district court ruled and found that there wasn't anything, there wasn't any factual dispute with respect to either search. I have a couple of minutes left. I'm happy to answer any other questions the court might have, but otherwise I'll submit on the briefs. Any further questions on the bench? Okay, thank you. Let's put two minutes on the clock for the other side. Thank you, Your Honor. Certainly the validity of the seizure has always been in question and was challenged by Mr. Rushing below. I think part of the difference in how what transpired is viewed by the government as opposed to by the defense is the question of when did the seizure occur? It is truly our position that Mr. Rushing was seized prior to Officer Nelson putting his on him. Under the Mendenhall factors, we have plenty to conclude that a reasonable person in Mr. Rushing's shoes would not have felt free to go when he was surrounded by three different officers, all of whom are in uniform, they're armed, they've positioned themselves in a way that bars him from entering the public sphere of the sidewalk after he's left the bar. The video shows that they have focused on him, not the white bystander next to him, and they repeatedly are asking him questions, suggesting that they plan on compelling him to succumb to their authority. So I wanted to put that out there. Also, there's been this discussion of the split-second decision, and that's just not accurate here because we're not him, but there is a significant passage of time when law enforcement is considering this question, and they're trying to figure out what to do with it. It just so happens that they take the most aggressive tactic available to them, and in so doing, they are, I would submit, giving up far more reasonable approaches like going inside the bar that I already mentioned, or perhaps even finding out whether Mr. Pines still has use of this vehicle. If I may wrap up, what we're dealing with here is a cross-racial identification that this court has already said is of low reliability when it comes to evidence, and I think that's very important to remember here, that the quality of the information that the police are operating under in making it the is just not enough, even under the differential Terry standard, and as in King, the Fourth Circuit case, the Sixth Circuit case, I am asking the court to conclude that the law enforcement action was not reasonable. Thank you, Your Honors. Okay, thank both sides for their helpful arguments. United States v. Rushing, now submitted for decision.
judges: W. Fletcher, Watford, Collins